# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **NO. 3:24-cv-01086** |
| **HOSPITAL HOUSEKEEPING SYSTEMS, LLC,** | ) ) ) ) | **JUDGE CAMPBELL** **MAGISTRATE JUDGE EVANS** |
| **Defendant.** | ) ) | |

## <u>MEMORANDUM</u>

Pending before the Court are cross motions for summary judgment. For the reasons discussed below, the motions (Doc. Nos. 30, 34) will be **DENIED**.

## I.     BACKGROUND

This is a civil rights case brought by the Equal Employment Opportunity Commission ("Commission") under Title I of the Americans with Disabilities Act of 1990 ("ADA"), as amended by the ADA Amendments Act of 2008, and Title I of the Civil Rights Act of 1991, to correct Defendant Hospital Housekeeping Systems, LLC's ("HHS") allegedly unlawful employment practices on the basis of disability and to provide appropriate relief to Jeffrey Springfield. (Complaint, Doc. No. 1). The Commission claims that HHS discharged Mr. Springfield because of his disability, blindness, in violation of the ADA, 42 U.S.C. § 12112(a).

Mr. Springfield is totally blind, an impairment substantially limiting his ability to see, read, and perform activities of daily living. (Pl. SOF ¶ 3).[1] Mr. Springfield's blindness is obvious, as he

---

[1]     The Commission's Statement of Undisputed Material Facts (Doc. No. 38) together with HHS's Response (Doc. No. 48) is cited as "Pl. SOF ¶ __."

uses a cane to safely walk and avoid obstacles. (Pl. SOF ¶ 4). Mr. Springfield also suffers from intellectual and developmental disabilities, substantially limiting brain function and affecting his ability to learn and communicate. (Pl. SOF ¶¶ 5, 12). Due to these disabilities, Mr. Springfield can neither read nor write. (Pl. SOF ¶ 6).

On March 10, 2021, Mr. Springfield applied for employment with HHS, a privately-owned company that contracts with healthcare facilities to provide food services, janitorial, and maintenance services. (Pl. SOF ¶¶ 1-2). HHS knew of Mr. Springfield's blindness and intellectual disabilities through his application materials, medical disclosures, and the obvious nature of his condition. (Pl. SOF ¶ 7; Answer, Doc. No. 8 ¶¶ 24-28).[2] Mr. Springfield's application and resume for employment discloses his graduation Tennessee School for the Blind and prior internship experience through Project Search (an unpaid internship program designed for individuals with intellectual and developmental disabilities) as a Dining Room Attendant and Sneeze Station Technician at Vanderbilt University Medical Centers. (Pl. SOF ¶ 9). As a Dining Room Attendant, Mr. Springfield cleaned tables and chairs and removed trash from tables. (Pl. SOF ¶ 10). As a Sneeze Station Technician, he maintained "sneeze stations" by stocking soap and sanitizer dispensers throughout the hospital. (Pl. SOF ¶ 10). Mr. Springfield's application stated he could perform the essential functions of a position with HHS with or without reasonable accommodation. (Pl. SOF ¶ 15).

---

[2]     HHS's Medical History Questionnaire maintained for Mr. Springfield contains a response of "yes" to the question of whether he has a "mental retardation/learning disability," and it includes handwritten response of "Total Blindness" in response to whether he has eye/vision conditions. (Pl. SOF ¶ 12). HHS's Post-Offer Employee Medical Questionnaire maintained for Mr. Springfield contains a handwritten response of "Blindness." (Pl. SOF ¶ 13). HHS's Respirator Medical Evaluation form maintained for Mr. Springfield contains a handwritten note stating, "I am blind. I require text-speech application of material read to me." (Pl. SOF ¶ 14).

HHS requires new hires to pass an Essential Functions Test ("EFT") with a 100% score. (Pl. SOF ¶ 16; Answer, Doc. No. 8 ¶ 29). The EFT is intended to objectively measure whether employees are physically able to meet the essential functions of positions and requires employees to perform movements demonstrating abilities such as grip strength, dexterity, mobility, and balance. (Pl. SOF ¶ 17; Answer, Doc. No. 8 ¶ 29). On May 14, 2021, Mr. Springfield passed the EFT with a 100% score. (Pl. SOF ¶ 18).

On May 14, 2021, HHS hired Mr. Springfield as a Police Tech/Non-Patient Room Cleaner ("Police Tech") at Vanderbilt Wilson County Hospital, and he remained in this role until HHS terminated his employment on August 26, 2022. (Pl. SOF ¶ 19). Mr. Springfield worked as a Police Tech part-time, approximately 40 hours per two-week pay period. (Pl. SOF ¶ 20). As a Police Tech, HHS expected Mr. Springfield to refill "sneezing stations," replacing soap and sanitizer dispensers at the hospital. (Pl. SOF ¶ 21; Answer, Doc. No. 8 ¶ 31). Mr. Springfield worked for HHS with the assistance of a Job Coach, assigned by Project Search. (Answer, Doc. No. 8 ¶¶ 32, 33). Mr. Springfield never received any documented disciplinary action during the course of his employment with HHS. (Pl. SOF ¶¶ 26, 28; Answer, Doc. No. 8 ¶ 35). Rather, during his employment, Mr. Springfield received two merit pay increases. (Pl. SOF ¶ 27). Furthermore, Mr. Springfield never injured himself or anyone else as an HHS employee. (Pl. SOF ¶ 74).

On Wednesday, August 24, 2022, Mr. Springfield experienced a non-injury fall while at work, in which he caught his foot on a door and landed on his elbows. (Pl. SOF ¶ 29). Mr. Grant, one of Mr. Springfield's direct supervisors, completed a "Notice Only" Workers' Compensation Claim confirming that Mr. Springfield did not receive medical treatment, did not miss work, and returned to "Full Productive Day" on August 24, 2022. (Pl. SOF ¶ 36). Mr. Springfield worked his shift as usual on August 25 and 26, 2022. (Pl. SOF ¶ 38).

Around noon on Wednesday, August 24, 2022, Kathryne Giovannini, Senior Vice President of Healthcare, sent the following email, stating:

> Hello All,
>
> I have a unique situation at PC 466 Vanderbilt Wilson County.
>
> Prior to me supporting the account, we had a team member start to work in the department who is blind. This was supported due to our short staffing, and our ability to pay for his 20 hours/week within our budget. He currently fills hand sanitizer in the hallway, the same hallways, four days a week. This is something the hospital CEO strongly believes in, as we are supporting and hiring this specific team member and their community program, Project Search.
>
> The team member, Jeff Springfield, fell a couple weeks ago, but he was fine. I discussed this with hospital leadership and my concern for his safety while working at the location. Our direct report, Whitney Hall, said the CEO wanted him to continue to work for us and that we could not discuss moving him out of the department until we were fully staffed.
>
> Today, Jeff fell again. Our Director, Julius Grant, caught up with Jeff as they were transporting him to the hospital ER. Jeff stated he was fine and he did not need to seek medical attention.
>
> Do we need to have him sign the 'refusal of medical attention' document, as he cannot read the document? I am concerned about the potential liability here if he falls again and it is more severe. Our Director did communicate to our direct report that he fell, and she asked if he was ok.
>
> We have a meeting with his job coach, and we are working with the job coach on other jobs within EVS for him to complete, but they all seem to have safety concerns attached.
>
> Please let me know what you recommend us doing going forward, pertaining to the safety concerns presented and his previous two falls within the department. I am not sure if he is also within a protected class, which is why I am including Lisa for guidance.

(Doc. No. 30-1)

4

Jeff Totten, President of Risk and Compliance and Chief Administrative Officer, responded less than 30 minutes later, stating:

> Per our conversation, enter the event as a "Notice Only" event.
>
> I do not believe that this person is in a protected class as it relates to employment with HHS and could not pass several of our job requirements so, in my opinion, we should not be employing this team member. If the Hospital feels so strongly about this person's employment, I would suggest that they put him back on their payroll. Minimally, we would need a waiver of liability to continue to employ this team member.
>
> Lisa?

At 3:46 p.m. Lisa Molnar, President of Human Capital Management, responded:

> I agree with Jeff. We need to place him on leave at this point and have a discussion with the facility on the safety of the employee based on these two incidents as well as our essential functions.
>
> Him being blind is covered under the ADA but he needs to still be able to do the essential functions with or without accommodations. Those accommodations cannot put the employer at an undue hardship, I would argue at this point they do because we are limited on what he can do, he can't complete on the essential functions and he has now put himself at risk.

The next day, Thursday, August 25, 2022, Kathryne Giovannini, sent the following email:

> Hello Lisa/Jeff,
>
> I spoke to the customer today and they stated that even if they were able to get a waiver signed, it would probably not be approved or pushed through at Vanderbilt.
>
> They understand that Jeff is an HHS employee and they support our decision to protect his safety and release him from his duties at the PC.
>
> Julius and I can meet with Jeff tomorrow to discuss the importance of his safety and then separating employment. Lisa-Do you have a specific document/language you would like me to use when completing the termination document?

On Friday, August 26, 2022, Kathryne Giovannini, Senior Vice President of Healthcare, sent the following email, stating:

> Hi Lisa/Hannah,
>
> We were planning on bringing Jeff in today to review the separation of employment document with him.
>
> Do you think it could be ready to deliver to him today or should we wait until next week?

Lisa Molnar, President of Human Capital Management, responded at 9:39 a.m.:

> Sorry, Katie.
>
> We should sit down with him and explain the fact that he has fallen two times based on his inability to perform the essential functions of the job with accommodation that we can provide. At this time based on his safety and others, we do not have another position he would be able to work or additional accommodations that we would be able to provide and allow him to still complete his tasks. We will be separating his at-will employment. He is eligible for unemployment.

Around an hour later, Lisa Molnar emailed Kathryne Giovannini stating:

> Please note an employee has to be able to complete the essential functions with or without accommodations. If accommodations are needed the employer must comply as long as it does not put the employer at undo hardship financially.
>
> This might be challenged since we did not go through the full ADA review but he should not have been hired if he was unable to complete the essential functions and a position / job duties for HHS.

(Doc. No. 30-1).

On August 26, 2022, HHS terminated Mr. Springfield's employment. (Pl. SOF ¶ 60). HHS did not administer an EFT to Mr. Springfield before terminating his employment on August 26, 2022. (Pl. SOF ¶ 72). Neither of Mr. Springfield's direct supervisors, Julius Grant and Jordon Dixon, recommended HHS terminate Mr. Springfield's employment. (Pl. SOF ¶¶ 57, 59).

On December 13, 2022, Mr. Springfield filed a Charge of Discrimination with the Commission alleging HHS violated the ADA. (Pl. SOF ¶ 76). On July 2, 2024, upon conclusion of the Commission's investigation, the Commission issued to HHS a Letter of Determination finding reasonable cause to believe HHS unlawfully discharged Mr. Springfield because of his disability. (Pl. SOF ¶ 77). The Letter of Determination invited HHS to join the Commission in information methods of conciliation to endeavor to eliminate the alleged unlawful employment practices and provide appropriate relied. (Pl. SOF ¶ 78). After issuing the Letter of Determination, the Commission engaged in communications with HHS to provide HHS the opportunity to remedy the alleged discrimination described in the Letter of Determination. (Pl. SOF ¶ 79). Despite the parties' conciliation efforts, communications between the Commission and HHS did not result in a conciliation agreement acceptable to the Commission. (Pl. SOF ¶ 80). On July 31, 2024, the Commission issued a Notice of Failure of Conciliation advising HHS the Commission was unable to secure a conciliation agreement acceptable to the Commission before filing this lawsuit on September 10, 2024. (Pl. SOF ¶ 81).

The parties filed their competing motions for summary judgment on September 10, 2025.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Trustees of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 488 (6th Cir. 2024) (citation modified). "Where the moving party has the burden of proof his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Id*. at 488–89 (citation

modified). "Put differently, when the moving party bears the burden of proof, their initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Id*. at 489 (citation modified).

The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). When reviewing cross-motions for summary judgment, courts must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party. *Frenchko v. Monroe*, 160 F.4th 784, 795 (6th Cir. 2025).

## III.   LAW AND ANALYSIS

"Title I of the ADA prohibits employers from discriminating against a qualified individual because of a disability." *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020). "To recover on a claim for discrimination under the ADA, a plaintiff must show that he or she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability." *Ferrari v. Ford Motor Company*, 826 F.3d 885, 891 (6th Cir. 2016). "Employees can prove discrimination in two ways, either directly or indirectly, and each has its own test." *Blanchet v. Charter Communications, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022). "The distinction between when to apply the direct versus the indirect evidence test is vital because the framework for analyzing the two kinds of cases differs." *Id*. (citation modified).

If there is direct evidence that a plaintiff suffered an adverse employment action because of his or her disability, the plaintiff then bears the burden of establishing that he or she is disabled

and otherwise qualified for the position despite his or her disability: (1) without accommodation from the defendant; (2) with an alleged essential job requirement eliminated; or (3) with a proposed reasonable accommodation. *See Ferrari*, 826 F.3d at 891. Once a plaintiff has introduced direct evidence of discrimination under the ADA, the defendant bears the burden of proving that a challenged job criterion is essential or that a proposed accommodation will impose an undue hardship upon the defendant. *See id*.

Where a plaintiff relies on circumstantial evidence, the court will "apply the three-part burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)[.]" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775–76 (6th Cir. 2016). Under this familiar burden-shifting framework, "the plaintiff bears the initial burden of establishing a *prima facie* case." *Id*. at 776. To prove a prima facie case of disability discrimination by circumstantial evidence, a plaintiff must show that (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability. *See Ferrari*, 826 F.3d at 891. Notably, "a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to rebut the presumption of discrimination by producing admissible evidence that the adverse employment action was for a legitimate, nondiscriminatory reason. *See Burdine*, 450 U.S. at 254. "An articulation not admitted into evidence will not suffice." *Id*. at n.9. If the defendant meets its burden

9

of production, the plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision by persuading the court that a discriminatory reason more likely motivated the employer or by showing that the employer's proffered explanation is unworthy of credence. *See id.* at 256 (citing *McDonnell Douglas*, 411 U.S., at 804–805).

"When an employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision the *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant and the plaintiff has direct evidence of discrimination on the basis of his or her disability." *Ferrari*, 826 F.3d at 892 (citation modified). The Court will take up the parties' summary judgment motions in turn.

## A. HHS's Motion for Summary Judgment

Through its pending motion, HHS seeks summary judgment as to liability on the basis that Mr. Springfield was not a qualified individual and seeks summary judgment as to damages on the grounds that Mr. Springfield failed to mitigate his damages and that it acted in good faith.

### 1. Liability

#### i. Prima Facie Case

HHS does not dispute that Mr. Springfield is disabled or that he suffered an adverse employment action when it terminated his employment. Rather, HHS contends that summary judgment is appropriate because "there are no material facts in dispute that would allow the EEOC to prevail on its claim, as it cannot establish that Springfield is a qualified individual with a disability." (Doc. No. 31 at 6, 2 ("Because his condition poses a direct threat to the health and safety of himself and others, HHS has no ADA liability."); *see also* Doc. No. 30 ¶ 1 ("The EEOC cannot make out a case of ADA discrimination against HHS because Jeffrey Springfield … was

not qualified for his position within the meaning of the ADA because HHS reasonably determined that he posed a 'direct threat' to himself and others.")).

Under the ADA, "the term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc) (emphasis in original). "The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id*. at 575-76. "Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id*. at 576.

Through its pending motion, HHS submits that the Commission cannot establish that Mr. Springfield was a qualified individual under the ADA because HHS determined that he posed a direct threat of harm to himself and others. (*See* Doc. No. 30 ¶ 1; *see also* HHS Notice, Doc. No. 57 at 2 ("Direct-Threat Determination is a Legitimate, Non-Discriminatory Reason for Termination" … "To the extent Springfield posed a direct threat – as the record establishes – HHS's decision to end his employment was based on a legitimate, non-discriminatory safety rationale, not on his disability.")).[3] However, in determining whether plaintiff has made out a prima facie

---

[3]    HHS's briefing on the "direct threat" seems to mischaracterize *Smith* as standing for the proposition that the plaintiff must show he is not a direct threat to prove a prima facie case:

> …**This element-of-the-claim view of things might place <u>the burden of proof on *plaintiffs*</u> to show that <u>they did not qualify**</u>

11

case of discriminatory discharge, a court "must evaluate whether a plaintiff established his qualifications independent of the employer's proffered nondiscriminatory reasons for discharge." *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 585 (6th Cir. 2002) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir. 2000) ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage ... a court must examine plaintiffs' evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff.")).

As HHS does not advance any arguments beyond its proffered reason for Mr. Springfield's termination – safety concerns – as to why Mr. Springfield was not a qualified individual, it fails to

---

> **as a direct threat**. *See LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 836 (11th Cir. 1998).
>
> *Smith*, 194 F.4th at 949 (emphasis in original) and added)). Notably, the EEOC does not cite the *Smith* case in its Summary Judgment Brief, despite the fact that it is directly on point. Instead, the EEOC erroneously characterizes "direct threat" as an affirmative defense as opposed to an element of the *prima facie* case …. The EEOC's argument fails a matter of law, and is clearly rejected by the Sixth Circuit's opinion in *Smith*. Instead, it is the EEOC who has the burden of proving that Springfield was not a direct threat in the workplace as part of its *prima facie* case…

(Doc. No. 47 at 4-5 (quoting *Smith v. Newport Utilities*, 129 F.4th 944, 949 (6th Cir. 2025)). In setting forth the Sixth Circuit's analysis of the "direct threat" provision in *Smith*, HHS omits the court's conclusion:

> This element-of-the-claim view of things might place the burden of proof on *plaintiffs* to show that they did not qualify as a direct threat. *See LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 836 (11th Cir. 1998).
>
> The parties do not engage with this burden-of-proof question, so we opt not to resolve it. We will instead assume that Newport Utilities bore the burden to show that Smith qualified as a direct threat of harm if he remained in his role as a bucket foreman. As a result, we will also assume that the company could obtain summary judgment only if it "affirmatively introduce[d]" such evidence that "no rational jury" could disagree with its conclusion that Smith represented a direct threat of harm. *Lemaster v. Lawrence County*, 65 F.4th 302, 310 (6th Cir. 2023).

*Smith*, 129 F.4th at 949 (emphasis in original). When viewed in its entirety, it is clear that *Smith* assumed that the defendant bears the burden of proof to show that a plaintiff qualified as a direct threat of harm.

12

carry its burden (as the moving party) to show that the EEOC cannot show that Mr. Springfield was a qualified individual under the ADA.

      ii.   Direct Threat Defense

The ADA defines the term "direct threat" as a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. 42 U.S.C. § 12111(3); 29 C.F.R. § 1630.2(r). "Because few, if any, activities in life are risk free, the ADA do not ask whether a risk exists, but whether it is significant." *Bragdon v. Abbott*, 524 U.S. 624, 649 (U.S. 1998) (citation modified).

> The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
>     (1)  The duration of the risk;
>
>     (2)  The nature and severity of the potential harm;
>
>     (3)  The likelihood that the potential harm will occur; and
>
>     (4)  The imminence of the potential harm.

29 C.F.R. § 1630.2(r).

"The risk assessment [for purposes of the "direct threat" provision of the ADA] must be based on medical or other objective evidence, and not simply on that person's good-faith belief that a significant risk existed." *Bragdon*, 524 U.S. at 649–50 (citation modified); *Chevron v. Echazabal*, 536 U.S. 73, 86 (2002) ("The direct threat defense must be based on a reasonable medical judgment and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job.") (citation modified); *Holiday v. City of*

*Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000) ("In order to properly evaluate [an employee] on the basis of his personal characteristics, the employer must conduct an individualized inquiry into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question.").

Here, HHS asserts – without citation to the record – that "Springfield's two falls while performing his job demonstrated his inability to perform his job safely." (Doc. No. 31 at 9). Of course, a party's assertions in their brief are meaningless unless supported as provided for in Rule 56. *See* Fed. R. Civ. P. 56(e); *see also Associacao Brasileira de Medicina de Grupo v. Stryker Corp.*, 891 F.3d 615, 621 (6th Cir. 2018) ("an attorney's statement in a brief is not evidence."). Accordingly, the Court turns to HHS's statement of undisputed material facts filed in support of its motion for summary judgment, (*see* Doc. No. 32 ¶¶ 9-10 (citing Exhibit A, HHS E-mails, Doc. No. 30-1)), which directs the Court to an email chain as the sole evidence of its individualized assessment. *See supra*. However, HHS fails to explain anywhere in its filings which part(s) of the lengthy chain shows an individualized assessment of Mr. Springfield's blindness and the impact it might have on his ability (at that time) to safely perform the essential functions of his job. In the absence of any such analysis, HHS fails to show summary judgment should be granted on this basis as a matter of law or fact.

2. <u>Damages</u>

HHS claims summary judgment is appropriate on any claim for backpay or front pay on the basis that "there is no evidence that Springfield has mitigated his damages." (Doc. No. 30 ¶ 3). In support, HHS asserts that the Commission's "discovery responses demonstrate that Springfield had had either no job search at all or had an incredibly limited job search over the course of the past three years – not nearly enough to satisfy the duty to mitigate." (Doc. No. 31 at 14).

14

The Commission responds that, to contest Mr. Springfield's entitlement to backpay and front pay, HHS has the burden to show that (1) similar positions were available; and (2) the employee did not use reasonable care and diligence in seeking such positions. (Doc. No. 40 at 18-19 (citing *Gunter v. Bemis Co., Inc.*, 906 F.3d 484, 490 (6th Cir. 2018)). It notes that where, as here, a defendant has offered no evidence indicating that: (1) substantially equivalent positions were available or (2) the claimant failed to use reasonable care and diligence in seeking such positions, the Sixth Circuit had held that "a plaintiff has no legal obligation to demonstrate that he sought or obtained comparable employment after his unlawful termination." (Doc. No. 40 at 18 (quoting *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 800-01 (6th Cir. 2018)). HHS filed a reply (Doc. No. 46) but does not argue the Commission's opposition on this point is incorrect or that it has not met its burden of proof to contest Mr. Springfield's entitlement to backpay and front pay. In short, HHS has failed to show the absence of material disputes of fact or that it is entitled to judgment as a matter of law on the affirmative defense of failure to mitigate.

Finally, HHS contends the claims for compensatory and punitive damages fail as a matter of law because there is no evidence that it did not act in good faith and there has been no evidence produced regarding emotional injury to Mr. Springfield. (Doc. No. 30 ¶ 4; Doc. No. 31 at 15-16). HHS cites exclusively to out of circuit authority addressing the good faith defense in connection with failure to accommodate claims, which the Court finds unpersuasive in the present case that does not include a failure to accommodate claim. (*See* Doc. No. 56). And HHS does not even attempt to articulate a developed legal analysis in support of its challenge to the availability of punitive damages. Therefore, summary judgment is inappropriate as to the claims for compensatory and punitive damages.

## B. Commission's Motion for Summary Judgment

The Commission asserts that summary judgment is appropriate in its favor on liability because there are no material facts in dispute that Mr. Springfield: (1) is disabled within the meaning of the ADA; (2) was qualified for his job; and (3) was terminated because of his disability. (*See* Pl. SOF ¶¶ 3-28, 49-61, 72-75). In its response, HHS does not dispute that the Commission produced evidence that satisfies each element of its disability discrimination claim. Nor does it dispute that its employees relied on Mr. Springfield's blindness in making the decision to terminate his employment. Instead, HHS asserts that Mr. Springfield was not qualified for his job based on its determination that he posed a "direct threat" to the safety of himself and others. The Court has already explained that it cannot consider HHS's asserted basis for termination in determining whether the Commission has proof of the prima facie case. *See supra*.

Ultimately, the parties argue the same piece of evidence – the email chain (Doc. No. 30-1) – warrants summary judgment in their favor. HHS submits that the email chain is evidence that it conducted the requisite individualized assessment to reach its determination that Mr. Springfield should be terminated for safety reasons. Whereas the Commission submits that the email chain is direct evidence that HHS terminated Mr. Springfield's employment because it *assumed* he could not perform the essential functions of his job with or without reasonable accommodation of his blindness. This is a material dispute of fact that cannot be resolved on summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the Commission's motion (Doc. No. 34) and HHS's motion (Doc. No. 30) will be **DENIED**.

An appropriate Order shall enter.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE